Case number 17-7059, American Freedom Defense Initiative, et al., Appellants v. Washington Metropolitan Area Transit Authority, WMATA, et al. Mr. Muse for the Appellants, Mr. Verrilli for the Appellants. Good morning. Good morning. May it please the Court, I'm Robert Muse, and it's my honor and privilege to represent the plaintiffs' appellants in this important First Amendment case. And I'd like to reserve three minutes of my time for rebuttal. To briefly summarize the principal issues before this case, first, highlighting that WMATA's restriction on my client's speech is inherently viewpoint-based, thereby largely rendering unnecessary any extended treatment of other questions before this Court. And closely related to the viewpoint-based restriction on my client's speech is the fact that these restrictions are unconstitutional due to their lack of objective criteria by which WMATA officials are permitted to censor such speech. I just want to be clear on one thing. You're here on the denial of a preliminary relief, correct? We're here on a cross-motion for summary judgment, where summary judgment was granted in favor of WMATA. So you're well beyond preliminary injunctions? We are well beyond that, Your Honor. I'm glad to hear it. So its final decision is de novo review. In fact, it's even beyond that. Under Bose and Hurley, the Supreme Court said the Court must do a de novo review of all the facts because of the First Amendment issues involved. You haven't submitted a new ad under the November guidelines, right? We have not, Your Honor. The ad that we've submitted, from our perspective, is still pending to be approved, and that's the reason why we filed this lawsuit. And obviously there was the issue which this Court wanted the parties to address in supplemental briefing regarding the fact that during the pendency of the litigation, it went from the moratorium to these final regulations, which basically just finalized what the moratorium was in more specific terms in November. And I think both parties agree that the challenge is not moved as to those new regulations. It's really a continuation of the harm caused by the moratorium that was put in place. The ad was denied under the moratorium? The ad, just to be clear, the ad was submitted when the forum was open on May 20th. Right, but the denial happened after the interim policy went into effect, and there was a denial based on the interim policy. There was a denial based on the interim policy, and again, from our perspective, we never withdrew the ads. The ads are still pending, waiting, hopefully a favorable decision from this Court, and they will go up at some point in time. But it was under the moratorium which was focused on issue-oriented advertising. Again, the November 19th policy was just a continuation of that. And with regard to the forum question, it's really an interesting question because I think under Cornelius, the forum, even after the moratorium and the policy change, should still be considered a public forum. One of the things I think there's a problem, and there's perhaps a misunderstanding or even a confusion in the courts on the forum question, when you treat this as a limited public forum, and I have no problem with using that term, limited public forum, but it's appropriately considered a subcomponent of a designated public forum and not a non-public forum. Because in effect what you're doing is you're treating this transit advertising space, right, because we're going to focus on what the forum is. It's advertising space, space that the government has intentionally opened for people to engage, for the public to engage in speech. It's not just the government speaking. Comparing that and making it analogous, for example, to the walls of this courtroom, which is plainly a non-public forum. So what's the comparison with Lehman, though? Because in Lehman also you had advertising space, and it's also the case that there was some speech allowed, but there was some speech fenced out, i.e., issue-oriented political advertising. Just to be clear, Your Honor, in Lehman they said political campaign speech. So even in a limited public forum, designated public forum, you can make categorical restrictions on speech, but those categories have to be distinct and unambiguous. You think there's a meaningful First Amendment distinction between – I think it did say political campaign at one juncture, but I don't know if it was always described in those terms. But anyway, do you think there's a material First Amendment distinction between political campaign speech and politically oriented speech? I think what is important is if you can make that category definite and distinct, whereas I think political campaign speech is definite and distinct, political speech is not. Political speech is an amorphous concept that you can virtually turn anything into a political issue. So if you're going to limit categories in a designated public forum – and under Cornelius, the Court says you can limit it by categories of speech, you can limit it by the speakers. Wait a minute. You're sticking to political speech. I thought we were talking about campaign. He was asking me if he thought that there was much of a distinction under the First Amendment between political campaign speech and political speech. Do I understand the question correctly, sir? Yes, and I thought in Layman, though, it was that the policy itself spoke in terms of political advertising as such, right? It was treated as political campaign advertising. Now, and I will say, Layman – and there's time for Layman to be revisited. In fact, I – We can't do that. I understand that, but Layman didn't address it in terms of the forum analysis, and that's – But Cornelius then rethought – I mean, you may be right that at the time Layman was decided it wasn't a forum case because we didn't really have forum doctrine, but then Cornelius described Layman as a non-public forum case. Yes, Your Honor, and – but the – again, if you look at how the development – Widmar v. Vincent, for example, is treated as a designated public forum. And even if you look at Lance Chapel, this is kind of where it's blending into the viewpoint discrimination component. These – and this is where it goes to the point where the categories have to be specific because even in a non-public forum, viewpoint discrimination is prohibited. Yes, so I – that has to be true. I think that Cornelius in the case would say that, too. But just on the subject of whether we're dealing with a non-public forum or a designated public forum, it would help me if you explain what the distinction is between Layman and this case. If we assume – and I – it seems like you've bracketed an argument, but let's assume that Layman now, under Supreme Court precedent, is treated as a non-public forum case where the forum is determined to be a non-public forum. We're bound by that. What would be the distinction between Layman and this case that would allow finding that Layman involved a non-public forum and this case involves a public forum, whether you call it designated or limited or whatever? I think if you look at the evolution of the forum doctrine, because Layman didn't address it in those terms. And if you look – like, for example, the International Society for Christian Consciousness versus Lee Supreme Court case, they describe the second category of public property as the designated public forum, whether of a limited or unlimited character. And the limited nature is what Cornelius talks about, is where you can limit it by who the speakers are or what the categories are, so long as they're precise. And here, arguably, I don't have any problem with the fact that they limit the speakers to those who are willing to pay for advertising. That's a legitimate restriction. But then once you get into that restriction, if you have these amorphous terms, you're creating these problems in here with the viewpoint-based nature. But even from the forum perspective – and they go on to say here, regulations of such property is subject to the same limitations as that governing a traditional public forum. So I really think that the forum analysis is problematic. Maybe it might not be for this Court to resolve, but if you look across the landscape, it is a problem. And it's one of the problems that I keep hammering every time I bring one of these cases, and hopefully we get to the Supreme Court on that forum issue. But even leaving aside the forum issue, you don't even have to address that because these restrictions themselves are inherently viewpoint-based. They don't restrict topics. For example, gambling. You can put an ad up there for a casino. But if I wanted to put an ad up there because I oppose gambling based on a Baptist belief or view or something, that's prohibited. That is quintessential viewpoint discrimination. And the fact that they may limit – Well, that's a hypothetical. We don't know that that would be true under the new law. Well, we do under the regulations that gambling is not a topic that's prohibited under the categories. Abortion is not even a topic that's prohibited under the family claims. But the gambling ad could be rejected perhaps on the ground that it's controversial in the way you're describing. But if you're going to base your restriction on the fact that the ad is controversial – and United Food, which is a very good case in the transit authority on the Sixth Circuit, they have a restriction on ads that are controversial. And the court said, no, that is inherently – not only is it viewpoint-based, but it lacks objective criteria that gives them the unbridled discretion that then allows for viewpoint discrimination. So put aside the unbridled discretion for just a moment. Can you elaborate on why it's viewpoint-based? Why it's viewpoint-based? Because they don't distinguish based on categories. They distinguish based on viewpoints of categories. The gambling is just a good example of defense contractors. I know defense contractors run ads all over WMATA. But if I wanted to – and obviously a defense contract ad is by a company that supports government spending of defense. And people have objected to those types of ads being out there. But if I wanted to object to it on religious grounds or any other grounds, I couldn't do that. Okay. Now, I understand. So on that, here's what Justice Brennan said in the dissent in Layman, which is that a cigarette company is permitted to advertise the desirability of smoking its brand, but a cancer society is not entitled to caution by advertisement that cigarette smoking is injurious to health. So it sounds to me like your argument as to why this is viewpoint is the same argument that Justice Brennan was – Justice Brennan understands. I think there's a great deal of confusion between content and viewpoint. And I think the point was that he was trying to say that this policy shouldn't be upheld precisely because it leads to these kinds of problems. And the majority in Layman disagreed with that and thought, actually, this is okay and it's non-viewpoint based. Otherwise, it would have been unconstitutional. But I think, again, if you look at the Secret Lambs Chapel, for example, right? That was a non-public forum where they said child rearing and family issues were a topic that could be discussed. But you couldn't discuss it if you had a religious viewpoint addressed to it. And the court struck it down. That's precisely what we have here. But I'm not quite – it sounds to me like what you're saying is that the distinctions that Justice Brennan was drawing in Layman are the same ones you're drawing. And I'm not saying that there's no substantive force to them. I'm just saying that they seem to be the same distinctions that were being drawn there. And the way he described it there is that the discrimination is among entire classes of ideas rather than among points of view within a particular class does not render it any less odious. So he allowed that we're not talking about viewpoint. We're talking about a content-based distinction. And he thought it was problematic for exactly the same reasons that you're saying, but evidently the majority didn't think so. Well, you have to read that in light of Lambs Chapel, which is a far more recent decision than the Layman case on what constitutes viewpoint discrimination, and Lambs Chapel is on all fours. You look at Rosenberger as well, same thing with viewpoint discrimination. This is viewpoint discrimination. Grant, I understand the dissent in Layman, but they didn't treat it in the right forum context. But if you look at the – Mattel v. Tam, the court made a – giving offense is a viewpoint, the court said, when they struck down in a copyright. It wasn't even dealing with a forum question. So plainly after Lambs Chapel, this is viewpoint discrimination. I believe I'm going over my time at this point. Thank you. Good morning. Good morning, and may it please the Court. In Cornelius, the Supreme Court defined viewpoint discrimination in a public forum as denying access to a speaker solely to suppress the point of view he espouses on an otherwise-includable subject in the forum. Nothing like that happened in this case. WMATA's advertising policy is viewpoint neutral on its face, is viewpoint neutral in its application, and it was adopted for viewpoint neutral reasons. Can I stop you just to ask my question? I may be beating a dead horse. I know both parties have said this is not – but have you indicated to the plaintiff either by the – that anything denied under the moratorium we are automatically going to reconsider, or on the other hand, have you said anything denied under the moratorium is going to have to be resubmitted under our guidelines? I'm not aware that WMATA said either, Your Honor. Okay. And we do think this is a close case on the question of mootness. It's definitely true that the ad was rejected under the interim policy, but the operative closure of the forum, the categories that were closed in the interim policy and the categories that were closed in the permanent policy in November are almost word-for-word identical. So we do feel like this is a case that's in the not the voluntary secession situation. This is a case like Associated General Contractors in which, yes, the regulations changed and made some changes, but they continued to operate in a way that gave rise to the problem that the petitioner was complaining about. Now, it's a little different here. It's certainly the case that AFDI could have amended its complaint to raise a direct challenge to the permanent guidelines, but they did argue in their summary judgment papers that the permanent guidelines were unconstitutional and the district court did rule on it. And we do think if you put Associated General Contractors together with the von Raab decision, which we also cited in our supplemental brief, which says that the court should adjudicate the matter on the basis of the regulations in force at the time that the court considers it, those are the now permanent regulations. So while we agree it's close, we do think that the correct answer is that the permanent policy, at least for purposes of prospective injunctive relief, which was the court's supplemental question, is before the court. Is it also possible to approach it so that even if it's non-moot, that what we'd be addressing is the moratorium rather than the permanent policy on the theory that the moratorium was the one that was visited on the ad and the permanent policy wasn't as of yet? And even if it's non-moot as to the moratorium because there's not a voluntary cessation, then we would be addressing the moratorium. I would suggest respectfully that the court would approach that a little differently. I think what von Raab holds is that in a situation like this one, where we're talking about prospective injunctive relief, that actually what would be addressed is not the moratorium but the current policy. Von Raab is a case about federal drug testing regulations. The regulations changed, but the court adjudicated the Fourth Amendment violation with respect to the then current regulations, not the ones that were objected to at the time. Now, so I think with respect to prospective relief, that's the right way to think about it. Certainly, though, with respect to retrospective relief, I definitely think that's right. Now, with respect to retrospective relief, WMATA has sovereign immunity, so no relief against them. The general manager was sued only in his official capacity, so no damage is there. Anyway, if I could, I wanted to just address a point that Your Honor raised, with respect to Layman. I think the language that Your Honor was searching for is on page 304 of the opinion, where the court holds that the decision to limit hard car space to innocuous and less controversial commercial and service-oriented advertising does not rise to the dignity of a First Amendment violation. So I do think Layman pretty conclusively resolved the question of whether that distinction is one that can properly be justified as representing closure of the forum and creation of a non-public forum. So can I ask this question about the closure of the forum? So suppose that the forum wasn't closed, but then the reason for denying the ad was that it was controversial, that the subject matter and the way that it was asserted was controversial. I take it that you'd agree that that's not something that could be done. It'd certainly be a much harder case than the one we have here to justify. I think probably we'd have to justify that on strict scrutiny grounds, and there might be some circumstance in which if the controversy created a very serious risk, public safety risk, probably could justify it on strict scrutiny grounds. But here, of course, they did close the forum. They closed it in a categorical way. So here's my question about that. So let's just assume, I get that it could potentially be attempted to be justified under strict scrutiny, but let's assume that that would fail just for argument purposes. If that's true, that the ad can't be denied on that basis and you keep the forum open, then why is it that it's okay to close the forum for exactly that reason? Yes, I think that gets to the heart, actually, of the person on the issue in the case, and permit me to address it if I could. I think the key thing is that in a situation, and the situation we have here, and I think it's indicated by Your Honor's hypothetical, the situation we have here, there's no doubt that the ad, AFDI's ad, prompted the reconsideration of the policy. So there's causation. Our witness, 30 v. 6 witness, acknowledged that. We acknowledge it in our briefs. But causation does not equal pretext. And I think there are three points that really drive that home. The first is that WMATA had genuine and substantial viewpoint-neutral policy reasons for making the change. Customer dissatisfaction, employee morale, safety, vandalism, and administrative burden. Those viewpoint-neutral justifications were directly implicated by the ad that AFDI submitted. Second, the decision WMATA made was to make an actually quite broad categorical change to the nature of the forum. What WMATA did here was to close the forum to all issue-oriented advocacy, political, religious, and otherwise. And it did so recognizing, as the record shows, that it was posing a risk to about 10% of the advertising revenues. Now, that's not a step anybody would take lightly. We're solely based on a desire to discriminate against this particular ad. And in fact, WMATA, at the very time that it adopted the interim policy in May, it also excluded two other ads at that moment. And this is at JA100, the Bowersox 30 v. 6 testimony. One from a corn farmer's lobby and another one from an airline lobby, which could hardly be thought of as controversial. And so I think that that shows you right at the moment that the policy was adopted that it was adopted and administered for viewpoint-neutral reasons. And the third point here is that this did not just come out of the blue. The issue had been percolating for quite some time at WMATA. These kinds of ads were of concern for years. We documented at page 8 of our brief the various other ads that had raised problems. They had been thinking about it. And there's no doubt that the AFBIN brought those concerns to the floor. But it was the combination of those three things, I think, tells you that you can't view this as an impermissible viewpoint discrimination. You certainly can't view it as violating the definition of viewpoint discrimination that the Supreme Court provided in Cornelius. So when you say pretextual, you mean as a pretext for viewpoint discrimination. And when you say viewpoint discrimination, you mean hostile to the viewpoint being asserted by the ad. Yes, I think it's not what I say, it's what Cornelius says. It really matters in that regard, but that is what Cornelius says. And just why is it that anything short of viewpoint is okay if anything short of viewpoint isn't okay as a basis for rejecting the ad as long as the forum stays open? Well, because if the rule were the opposite, then it would be virtually impossible ever to move from being an open forum to a non-public forum, to go from an open to closed, to make that kind of policy change, which the Supreme Court in Cornelius and other cases have said that government in this role always has to have the flexibility to do so long as it does it in a neutral way. Otherwise, you're just trapped if the rule is... So we just treat it as if we apply the same rubric as if the forum were never open to begin with and a jurisdiction were making a determination ex ante as to whether to open up the forum at all. Because in that situation, it's okay to say, look, we could open up a forum and we could allow all kinds of speech, but one of the problems is that there's going to be all kinds of controversy and we don't want to open this up to controversy and therefore we're going to only allow non-issue oriented advertising. And the point is that if they can make that decision ex ante before the forum's ever opened up, you can make that same determination after the forum's been opened up as a basis to close it. Yes, I think that's what Cornelius holds. And in fact, Cornelius was a case in which there was some controversy about the organizations soliciting funds to support their public interest advocacy. And the Court discussed that in the opinion in Cornelius in saying that that led to some concern that federal workers were going to be less likely to contribute to the combined federal campaign because they were turned off by that issue advocacy. And what if the jurisdiction, the forum's already open, and then the jurisdiction says, here's an ad that really gives us pause. Why does it give us pause? Because this viewpoint really is something that I abhor. But I realize that that could be a problem. And so what I'm going to do, and I'm not suggesting that this is pretextual in the kind of pejorative sense, but what I'm going to do is I'm going to realize that this entire subject matter is fraught with peril. And so, yes, it's the viewpoint of this ad that gives me the greatest pause, but on a going-forward basis, what we're going to do is to cut off the subject matter by saying issue or inadvertencing is out. Well, I think that you probably want to conduct a bit more of a subtle analysis there. And I think if, for example, you had evidence like what was before the First Circuit in the Ridley case, where you had testimony from the manager of the transit system saying, you know, I hate this message of this ad. I'm not going to allow it to be run. I will allow it to be run, the contrary position on the same issue. Then, you know, you have a problem. That's obvious. Of course you have a problem in that situation. If you have a situation in which the transit authority announces an ostensibly viewpoint neutral policy, but it is so dramatically under-inclusive that it doesn't really seem to be advancing the interest for which it's been implemented, you probably have an issue, at least a potential issue there, too. Or if you have a policy that's neutral on its face, but it's obviously not being enforced in a viewpoint neutral way, maybe you'd have an issue there, too. So it's not that you just get free pass. And you think you need evidence of that variety in order to get past summary judgment? Because if you allow that a viewpoint-based determination would render the closure of the forum invalid, then the question becomes, is there enough indicia of viewpoint-based determination to get to the jury? I think we've acknowledged that we don't take issue with the First Amendment's analysis in Ridley, but on the summary judgment record here, you don't have anything like that. What you've got is even-handed enforcement, facial neutrality, and a series of viewpoint-neutral policy justifications that are quite real and quite substantial and genuinely held. And under Anderson v. Liberty Lobby, even if you can go through the record and find one scintilla of evidence, that's not enough. You've got to look at the record as a whole and make the judgment as to whether there's a genuine issue of fact. It's just that they're not content neutral, they're viewpoint neutral, because there is evidence that could get to the jury if the standard were content neutrality as opposed to viewpoint neutrality. Yes, but that, of course, Cornelius says, that a transit authority always, that any government managerial operation always has the authority to move from one to the other. Committing to an open public forum does not forbid you from making a change to a closed forum in the future. The Court has no further questions. All right. Thank you. Will, why don't you take a couple minutes? Thank you, Your Honor. I want to address the, Your Honor, you asked the question about Lehman. He read you the quote from Lehman where they talked about how they closed, that they only allowed innocuous commercial advertising in the Lehman case. I don't see any of these guidelines where that is the situation here. In fact, we obviously have a long history of just the opposite, which kind of goes to the question of even if it's a non-public forum, whether the restriction on issue-oriented advertising, given the nature of the advertising, the characteristic of the forum, whether it's even reasonable. And I would contend that it's not, even if you assume you have a non-public forum. But here we don't, there isn't a restriction on, that just limits the advertising to innocuous commercial-only advertising. I mean, you can look at the guidelines themselves. But it is limited to issue-oriented advertising, right? I mean, it's, I'm sorry, what's fenced out is issue-oriented advertising. And I like, and I've been arguing here and in the briefs that that is inherently a viewpoint-based restriction. It's not a categorical restriction. That's what Lehman says. Revenue earned, just above that quote, revenue earned from long-term commercial advertising could be jeopardized by a requirement that short-term candidacy or issue-oriented advertisements be displayed on car carts. So it uses that term, issue-oriented advertisement, and thinks it's okay to exclude that. And again, I think after, I mean, we can, I don't want to repeat those same arguments. But if you look at, again, their ads don't limit it, though, because the section that was read was innocuous commercial advertising. It's not limited. And if you look at our ad, what is the topic of our ad? In fact, they say advertisers promoting contests are permitted. This is the winning entry of an art contest. So under their guidelines, apparently, if they're saying it's not controversial, then our clients could submit the same ad and say, look, we're selling these posters for $1. And it's a commercial ad. It's a sale of a poster. That's where we run into these problems with this whole form analysis where it's, in the transit advertising, that we run into these viewpoint problems. I mean, it's just inherent in the nature of treating a transit advertising space like the courtroom walls, which goes back to the beginning. I want to make one last point on the closing of the form, because they've been arguing that the only inference that was, you know, that is an animus to my client's ad was the timing. But it's more than that. We have that. We put the memorandum that was drafted at the time the client's ad was submitted, when they were looking at the MTA New York ban, and it says ban both religious and political ads. And then they go on to say the question then becomes if AFD ads can always be defined as religious ads. And so when you look at just the genesis of this thing, my client submits the ad on the 20th. It's received by them in the 22nd. Their first meeting is the 28th. They throw together this hasty moratorium. They throw in that issue of advocacy, because they can't figure out if it's religious or if it's political. And they have a memorandum that's on this. Even the moratorium that they produced had the date May 22nd when it was actually approved on May 28th. I mean, it's just to say that this is not pretext or there's not an inference of pretext is just absurd on this record. It's not just dealing with timing. And I'd like to address my time. Thank you.
judges: Henderson, Srinivasan, Ginsburg